**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CYNTHIA RUSHING MURPHY,** ) | |
| **as Personal Representative of the** ) | |
| **Estate of Jerry Lenson Murphy,** ) | |
| **deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:16-cv-143-WKW-DAB** |
| ) | |
| **ROBERT C. PRECISE, D.M.D.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendant's Motion to Exclude Testimony and Opinions of John F. Rothrock, M.D., ("Dr. Rothrock") and Ruben R. Garcia, M.D., ("Dr. Garcia") (Doc. 21). Defendant Robert C. Precise, D.M.D. ("Precise" or "Defendant") moves pursuant to Rule 702, Federal Rules of Evidence, and the principles of *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), to exclude the testimony and causation opinions of Plaintiff's tendered expert witnesses, Dr. Rothrock and Dr. Garcia. Plaintiff Cynthia Rushing Murphy, as personal representative of the Estate of Jerry Lenson Murphy, filed a response in opposition arguing both experts are qualified to offer opinions in this case and their proximate cause opinions satisfy the standards of Rule 702 and *Daubert*. (Doc. 26). Defendant has filed a reply. (Doc. 30). The Court heard argument on the motions on April 18, 2017. For the reasons that follow, Defendant's motion is due to be granted in part and denied in part.

### I. Standards of Law

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert* and in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, (1999), the Supreme Court directed trial courts to perform a "gatekeeper" function, designed to ensure that expert testimony is both relevant and reliable. As explained by the Eleventh Circuit:

> In *Daubert*, the Supreme Court explained that trial courts must act as "gatekeepers" tasked with screening out "speculative, unreliable expert testimony." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). In that role, trial courts may consider a non-exhaustive list of factors including (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community. *Id*. Later, in *Kumho*, the Court explained that the gatekeeping function governs all expert testimony based on "scientific, technical, or other specialized knowledge," not just scientific testimony. 526 U.S. at 147–49, 119 S.Ct. 1167 (quoting Fed. R. Evid. 702). The Court also stressed that the factors identified in *Daubert* "do not constitute a definitive checklist or test." *Id*. at 150, 119 S.Ct. 1167 (internal quotation marks omitted). While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's "gatekeeping inquiry must be tied to the facts of a particular case." *Id*. (internal quotation marks omitted). Furthermore, *Kumho* emphasized that the goal of gatekeeping is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152, 119 S.Ct. 1167.

*Adams v. Lab. Corp. of Am*., 760 F.3d 1322, 1327 (11th Cir. 2014).

This gatekeeping responsibility entails a three-part inquiry in which the court considers whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd*., 326 F.3d 1333, 1340–41 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of

expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (citation omitted).

## II.      Background

Plaintiff filed this action in March 2016 following the death of her husband, Jerry Lenson Murphy ("Murphy"), due to the alleged dental malpractice by Defendant.  (Doc. 1).  Plaintiff alleges Murphy was a 67-year-old Florida resident who presented to Defendant's dental practice Dixieland Dental in Midland City, Alabama, on March 5, 2014, to have several teeth extracted and new teeth added to his existing partial dentures.  *Id.* ¶ 8.  Murphy was initially evaluated by Defendant at 10:30 a.m. that morning.  *Id.* ¶ 9.  Plaintiff claims that during the evaluation Defendant learned or should have learned of Murphy's active medical and medication history.  *Id.* ¶ 9.  Plaintiff asserts that Defendant did not chart Murphy's blood pressure or other vital signs at that time, nor did he seek approval for the dental procedure from Murphy's primary physician or any of his other providers.  *Id.* ¶ 10.  Following the evaluation, Murphy left the office to return at 2:00 p.m. for the extractions and placement of partial dentures.  *Id.* ¶ 11.  Murphy returned to the office in the afternoon, and sometime after 3:00 p.m., he was reportedly administered "2.00 total carpules of Lidocaine with Epinephrine 1:100,000," and four or more teeth were extracted.  *Id.*  Immediately following the procedure, Murphy became disoriented, diaphoretic, and unresponsive. *Id.* ¶ 12.  He was transported by EMTs to Flowers Hospital and shortly thereafter transferred to Southeast Alabama Medical Center where he was diagnosed as having suffered "a massive pontine hemorrhage extending into the ventricles without hydrocephalus."  *Id.*  Murphy was determined to be non-surgical and subsequently died on March 8, 2014.  *Id.*  There were no pre-surgical, surgical, or post-surgical blood pressures contemporaneously recorded in Murphy's Dixieland Dental records.  *Id.* ¶ 13.  The records, however, included handwritten notes created by Defendant thirteen days after surgery in which he concludes Murphy's

pre-operative blood pressure was 174/87 and his blood pressure after becoming unresponsive was 228/129. *Id.* Plaintiff sued Defendant for dental negligence and breach of the applicable standards of care in (1) failing to properly evaluate Murphy's medical condition and/or obtain pre-procedure medical clearance; (2) undertaking extraction of four or more of Murphy's teeth; (3) failing to refer Murphy to an oral surgeon for evaluation and possible treatment; and (4) administering two or more carpules of Lidocaine with Epinephrine 1:100,000 to Murphy. *Id.* ¶ 16.

### III.    Experts

In support of her allegations and claims for damages, Plaintiff relies on the testimony of two experts: Dr. Rothrock and Dr. Garcia. The substance of their expertise and opinions and the motions to exclude each of these expert witnesses is discussed below:

A.    *Dr. Rothrock*

Dr. Rothrock received his undergraduate degree (B.A.) from Washington & Lee University in 1973 and his medical degree (M.D.) from the University of Virginia Medical School in 1977. He completed his internship and residency training in neurology at the University of Arizona in 1981. In 1981, he joined the faculty of University of Arizona as an assistant professor in the Department of Neurology. In 1983, he joined the neurosciences faculty at the University of California, San Diego (UCSD) where he established and directed the UCSD Headache Center. At UCSD Dr. Rothrock and his colleagues assisted in the development of such therapies as intravenous t-PA for acute stroke therapy and warfarin for stroke prevention in individuals with atrial fibrillation. He was promoted to the position of full professor at UCSD before leaving in 1994 to serve as Chair of Neurology and subsequently as Associate Dean for Clinical Research at the University of South Alabama. In 2006 he accepted a position as Professor, Vice-Chair and Medical Director of Neurology at the University of Alabama School of Medicine (UAB). While at UAB, he explored new therapies for primary intracerebral hemorrhage and acute ischemic stroke. From 2012 to 2015, he served as Professor and

Chair of Neurology Department at the University of Nevada (Reno) School of Medicine and Director of the Institute for Neurosciences at Renown Regional Medical Center. In 2015 he took his current position as Vice Chair of the Department of Neurology and Professor of Neurology at George Washington University School of Medicine. (Doc. 26-1 at 2–3).

His current duties include inpatient and outpatient clinical work, supervise residents and students, teaching, clinical research, and administrative work related to his position as vice chair. (Doc. 27-1 at 8–13).

Dr. Rothrock has specialty certifications in adult neurology, headache medicine, and vascular neurology. He has been involved in numerous areas of active independent research regarding stroke and headache and specific research projects focusing on diagnosis and management of stroke. Dr. Rothrock has presented and authored or co-authored extensively related to headaches and stroke. (Doc. 26-1 at 8–35). He is board certified by the American Academy of Neurology for stroke and the United Council for Neurologic Subspecialties for headache medicine. (Doc. 27-1 at 14).

Dr. Rothrock's opinions as set forth in his report are as follows:

1.      Given the temporal relationship between the dental procedure on March 5 and the onset of Mr. Murphy's stroke signs and symptoms, I consider it a matter of medical probability that Mr. Murphy's pontine hemorrhage and consequent death represented a direct consequence of the dental procedure performed.

2.      Given Mr. Murphy's known history of hypertension requiring treatment with multiple antihypertensive medications, the high likelihood that his chronic hypertension had produced associated weakening of the walls of the basilar branch arteries supplying the pons and the apparent blood pressure recording of 228/129 found at the time of Mr. Murphy's acute stroke, I consider it a matter of medical probability that the pontine hemorrhage occurred as a specific consequence of acute hypertension   associated with the March 5 dental procedure. Again the plaintiffs [sic] death probably resulted from the dental procedure involving extraction of multiple teeth.

3.      I believe it conceivable that the administration of epinephrine during the dental procedure may have contributed to Mr. Murphy's acute hypertension and the pontine hemorrhage that resulted.

(Doc. 26-1 at 5).  Dr. Rothrock's opinions are based on his review of the materials and literature listed in his report, his education, training, continuing study, research, and three decades of clinical experience as a board certified neurologist.  *Id.* at 3–6.

In his motion, Defendant does not challenge Dr. Rothrock's qualifications.  Rather, Defendant first argues Dr. Rothrock's causation opinions based on a temporal association between the stroke and dental care fall short of satisfying the requirements of Fed. R. Civ. P. 702 because the opinions lacks scientific reliability under a *Daubert* analysis.  (Doc. 21 at 11).  Specifically, Defendant contends a causation based upon a temporal sequencing of events does not constitute a recognized scientific methodology as required under *Daubert*.  *Id.* at 10–11.

Defendant next argues that Dr. Rothrock's opinion concerning the role epinephrine may have had in the stroke suffered by Murphy does not meet the standards giving rise to liability under the Alabama Medical Liability Act because he cannot opine the epinephrine use "probably caused the injury."  *Id.* at 12– 13.  Dr. Rothrock opines that it is "conceivable that the administration of epinephrine during the dental procedure may have contributed to Mr. Murphy's acute hypertension and the pontine hemorrhage."  (Doc. 26-1 at 5).  Defendant cites the following deposition testimony as evidence that Dr. Rothrock cannot opine that the epinephrine "probably" caused Murphy's stroke:

Q:    But to get down to it, you can't say that the epinephrine given with lidocaine by Dr. Precise to Mr. Murphy that day probably caused Mr. Murphy's stroke.

A:    I didn't use the adverb probably in my statement.  I used the adverb conceivably.

Q.    Right. And I took that to mean not elevating to a probability.  Did I understand that correctly?

A.    You did.

(Doc. 21 at 13) (citing Doc. 27-1 at 69–70).  Defendant argues that Dr. Rothrock's opinion regarding epinephrine use falls short of the standard mandated by Alabama law, and thus would not assist the trier of fact and should therefore be excluded. (Doc. 21 at 14).

Plaintiff responds that Dr. Rothrock's opinions are reliable and he is highly qualified to offer opinions in this case based upon his education, training, academic studies, and clinical experience. (Doc. 26 at 7–9).  Further, Plaintiff argues that Dr. Rothrock's causation opinions are not based solely on the temporal relationship between the dental procedure and Murphy's pontine hemorrhage.  *Id.* at 9–10.  Plaintiff directs the Court to the numerous case materials reviewed by Dr. Rothrock in connection with his analysis and opinions.  *Id.* at 10.  Additionally, Plaintiff notes Dr. Rothrock's opinion is supported by a number of articles in the peer-review medical literature regarding the mechanism by which a dental procedure such as a tooth extraction can provoke intracranial hemorrhage.[1]  *Id.* at 13.  Plaintiff argues a key factor in the causation analysis is whether there exists a logical sequence of cause and effect, which Plaintiff submits is supported here by the facts of the case and the expert testimony of Drs. Rothrock and Garcia.  Plaintiff distinguishes the toxic tort cases relied upon by the defense arguing the dose-response relationship, which is the hallmark of the science of toxic torts, is inapplicable here.  (Doc. 26 at 18).

In reply, Defendant submits that Dr. Rothrock in his deposition was unable to point to any other causal factor other than the temporal relationship between the teeth extraction and the pontine hemorrhage.  (Doc. 30 at 2–3).  Defendant distinguished the "logical sequence of cause and effect" cases relied upon by Plaintiff stating there was no *Daubert* challenge in those cases.  *Id.* at 3.  With regard to the "well-established" association between dental procedures and intracranial hemorrhage referenced in Dr. Rothrock's affidavit, Defendant submits the literature does not support such an

_____

[1] Plaintiff cites to five articles in the peer review literature that relate to intracerebral hemorrhage, cardiovascular and neuroendocrine responses, and subarachnoid hemorrhage during or associated with dental treatment. (Doc. 26 at 13 n.1).

association, and in any event, an association does not equate to a causal relationship. *Id.* at 4–7. Further, any association that may exist was admittedly "rare" by Dr. Rothrock's own testimony, and thus his statements in his affidavit that suggest otherwise should be disregarded as contradictory. *Id.* at 7.

B.     *Dr. Garcia*

Dr. Garcia is a general practitioner licensed to practice medicine in the State of Florida since 1991. He received his undergraduate degree (B.S.) from the University of Georgia in 1983 and a medical degree (M.D.) from the Morehouse School of Medicine in 1987. He interned at Southwest Community Hospital in Atlanta, Georgia, in 1988 and completed his residency training at Southwest Community Hospital in 1990. He was board certified by the American Board of Family Medicine from 1990–1997 and 2000–2007. He served as Medical Director for Walton County E.M.S. from 1997 to 2002. He is affiliated with Healthmark Regional Medical Center in DeFuniak Springs, Florida, where his office, Garcia Medical Clinic, LLC, is located. For 25 years, he has followed and treated patients who have suffered strokes and many patients who are at high risk for stroke. He has been Murphy's primary care physician since 1994. (Doc. 21-4 at 1).

Dr. Garcia's opinions are as follows:

1.     Because of Mr. Murphy's health status on March 5, 2014, in particular his multiple comorbidities, high risk of recurrent stroke, and pre-procedure blood pressure (reportedly 174/87) he was not physically suited to undergo a procedure involving multiple extractions by a dentist.

2.     Because of Mr. Murphy's health status on March 5, 2014, in particular his multiple comorbidities, high risk of recurrent stroke and pre- procedure blood pressure he was not physically suited to be administered *any* epinephrine.

3.     The multiple extraction procedure performed by Dr. Precise and the epinephrine administered to Mr. Murphy in connection with that procedure was the cause of Mr. Murphy's massive pontine hemorrhage at Dixieland Dental on March 5, 2014, and ensuing death at Southeast Alabama Medical Center on March 8, 2014.

*Id.* at 4–5.  His opinions are based on his twenty years of caring for Murphy, his twenty-five years of experience as a family and general medicine physician, his education, training, and review of the materials listed in his report.  *Id.*

Defendant challenges Dr. Garcia's qualifications, arguing Dr. Garcia has little, if any, qualifications or experience related to stroke and epinephrine use.  Defendant notes that Dr. Garcia would defer to a neurologist regarding treatment of acute strokes, and he has had no experience with epinephrine and dental procedures.

In his motion, Defendant seeks to exclude Dr. Garcia's single causation opinion:

> The multiple extraction procedure performed by Dr. Precise and the epinephrine administered to Mr. Murphy in connection with that procedure was the cause of Mr. Murphy's massive pontine hemorrhage at Dixieland Dental on March 5, 2014, and ensuing death at Southeast Medical Center on March 8, 2014.

Defendant argues the opinion should be excluded because it was based merely on his care and treatment of Murphy and two blood pressure readings from Defendant's dental records.  (Doc. 21 at 14) (Doc. 27-4 at 86–87).  To the extent Dr. Garcia's opinion is tied to the epinephrine usage, Defendant urges such opinion is unreliable as Dr. Garcia has had limited occasion to use epinephrine in his practice and he had no knowledge of the amount or concentration of epinephrine administered by Defendant.  (Doc. 21 at 14) (citing Doc. 27-4 at 1–6).  Dr. Garcia testified his most recent use of epinephrine in his practice was five to six years ago in an allergic reaction situation, and he has never used epinephrine in any dental context.  (Doc. 27-4 at 2–3).

Defendant submits that Dr. Garcia, like Dr. Rothrock, fails to point the court to any medical or scientific methodology or literature to support their opinions that the use of epinephrine caused Murphy's stroke, and thus their opinions should be excluded.  (Doc. 21 at 14–15).

Plaintiff responds that Dr. Garcia's opinion was based on more than the temporal relationship between the dental procedure and pontine hemorrhage.  (Doc. 26 at 20).  Plaintiff identifies the medical records and case materials reviewed and relied upon by Dr. Garcia in forming his opinions.

*Id.* Additionally, Plaintiff submits that a treating physician's opinion may be based upon personal examination of the patient, the patient's history, and the physician's knowledge and experience based on the treating relationship. *Id.* at 23–24. Plaintiff argues Defendant's challenge to Dr. Garcia's proximate cause opinion goes to the weight, not admissibility, of his opinion. *Id.* at 24.

In reply, Defendant argues merely because Dr. Garcia has treated Murphy in the past does not render Dr. Garcia's causation opinion reliable. (Doc. 30 at 8). Defendant contends case law relied upon by Plaintiff is legally and factually distinguishable. *Id.* Thus, Defendant submits Dr. Garcia's assertion that the epinephrine utilized during the dental procedure "most likely contributed" to Murphy's hemorrhagic stroke, without any scientific methodology in support, does not satisfy *Daubert's* reliability requirement. *Id.* at 10. Lastly, Defendant states Dr. Garcia's causation opinion should be excluded because Dr. Garcia testified he would defer to a neurologist regarding the cause of Murphy's stroke, and therefore his testimony would not serve to assist the jury. *Id.* at 11.

**IV.  Analysis**

As noted above, the Court's gatekeeping function entails a three-part inquiry in which the court considers whether the expert is qualified to testify competently regarding the matters he intends to address, the methodology by which the expert reaches his conclusions is sufficiently reliable, and the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue. *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1340–41 (11th Cir. 2003).

A.  *Dr. Rothrock*

Defendant does not dispute Dr. Rothrock's qualifications and credentials. Given Dr. Rothrock's extensive experience both clinically and in academia related to studying and evaluating the types and causes of stroke, management of stroke, risks of recurrent stroke, modification of stroke

risk factors, and therapies intended for stroke prevention, the court finds he is qualified to testify competently on the opinions offered here.

As for the reliability of Dr. Rothrock's methodology, the *Daubert* Court identified four noninclusive factors courts should consider: (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community. *Daubert*, 509 U.S. at 593–94.

Defendant contends Dr. Rothrock's causation opinions are unreliable and do not meet the standard for scientific evidence as set forth in *Daubert*. First, Defendant urges the court exclude Dr. Rothrock's first two opinions because they rely on a temporal sequencing of events to establish causation which Defendant argues does not constitute a recognized scientific methodology as required under *Daubert*. In support Defendant cites *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900 (M.D. Fla. 1996), in which the undersigned previously recognized, "[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid. 702." *Id.* at 906 (citations omitted). In *Cartwright*, however, the expert testimony involved complex toxicological conclusions that require a "[c]omparison of the known or estimated exposure to established reactive dose level," and the court found a noticeable lack of "any rigorous or quantitative analysis that is typically central to toxicological conclusions. *Id.* at 906. As Plaintiff argues in her response, toxic tort cases involving an analysis of a dose-response relationship are factually distinguishable from the types of opinions challenged here.

Further, Defendant's contention that Dr. Rothrock's causation opinions are "based on nothing more than a sequencing of events" ignores Dr. Rothrock's extensive training and practice as a neurologist in which he devoted a significant portion of his academic medical career to clinical

research involving cerebrovascular disease. In rendering his causation opinions in this medical negligence case, Dr. Rothrock has relied on the blood pressure readings before and after the dental procedure, the Alabama Certificate of Death, medical records from Dixieland Dental, Flowers Hospital, Southeast Alabama Medical Center, Dr. Garcia, Dr. Joseph Shalit, Dr. Marcelo Branco, CT scan from Flowers Hospital, Plaintiff's responses to interrogatories, and Defendant's response to discovery. Dr. Rothrock's review of these materials, coupled with his wide-ranging background as a neurologist, his research and participation in stroke studies, his authorship of numerous publications related to strokes, his clinical experience, his overall experience as a board certified neurologist, and the peer review literature discussing intracerebral hemorrhage during dental treatment satisfies the *Daubert* reliability requirement. In view of the nature of the opinions offered and Dr. Rothrock's specialized knowledge, the Court finds his first two causation opinions are sufficiently supported under Rule 702, and are likely to assist the trier of fact. The court's gatekeeping role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). Plaintiff is still able to challenge the credibility of Dr. Rothrock's opinions before a jury through cross examination and presentation of contrary evidence. Accordingly, as to Dr. Rothrock's first two opinions, Defendant's motion is **denied**.

Dr. Rothrock's third opinion that it is "conceivable that the administration of epinephrine during the dental procedure may have contributed to Mr. Murphy's acute hypertension and the pontine hemorrhage that resulted" is a little more troubling. To have a valid claim under Alabama's Medical Liability Act, a plaintiff "must provide evidence indicating that the negligence alleged is the proximate and *probable* cause of [the plaintiff's] injury; a mere possibility or one possibility among others is insufficient to meet the burden of proof." *Graves v. Brookwood Health Servs., Inc.*, 43 So. 3d 1218, 1223 (Ala. 2009) (emphasis in original) (citations omitted). Dr. Rothrock admittedly could not testify that the epinephrine given with lidocaine by Defendant to Murphy on the date of the

procedure "probably" caused Murphy's stroke. At best, Dr. Rothrock can testify that it was "conceivable." Given the Plaintiff's obligation to establish under Alabama law that the alleged negligence be the proximate and probable cause of the injury, the court finds Dr. Rothrock's opinion regarding the impact of the epinephrine usage will not assist the jury, and could lead to confusion as to the proper standard, when he opines it is conceivable, not probable, that the administered epinephrine may have contributed to Murphy's acute hypertension and resulting pontine hemorrhage. Accordingly, the court **grants** the motion as to Dr. Rothrock's third causation opinion related to epinephrine usage.

B.    *Dr. Garcia*

Of Dr. Garcia's three opinions contained in his report, Defendant challenges only the last one, the causation opinion. The other two opinions relate to the alleged breach of the standard of care; Dr. Garcia's standard of care opinions were not challenged in this motion or at the hearing and are not addressed by this order.

As to Dr. Garcia's causation opinion, the court concludes his opinion fails under the first prong listed above. While Dr. Garcia is no doubt an experienced clinician and his first-hand knowledge of Murphy's medical history based upon their long-term treating relationship will be relevant testimony, the court finds he lacks the experience to opine regarding causation matters related to the epinephrine usage in this case.

Unlike Dr. Rothrock, Dr. Garcia's education and training has not involved specialized knowledge or skill related to treating or studying stroke patients. Dr. Garcia is not a neurologist. In his general practice, he sees patients who have had strokes, but if one of his patients presented to the emergency room who was believed to be having an acute stroke, the patient would be immediately transferred to a neurologist. (Doc. 27-3 at 47–52). Additionally, Dr. Garcia testified he would defer to a neurologist regarding the cause of Murphy's stroke and whether the epinephrine used in this case

caused or contributed to Murphy's stroke. (Doc. 27-4 at 28).[2] As noted by Defendant, Dr. Garcia's familiarity and use of epinephrine in his practice is limited. *See* (Doc. 21 at 14) (citing Doc. 27-4 at 1–6). Accordingly, the court concludes Dr. Garcia lacks the knowledge and experience to offer a causation opinion in this case based upon the epinephrine usage in Murphy's dental procedure.

For the same reasons, Dr. Garcia's causation opinion would not assist the trier of fact, particularly when the opinion appears unsupported by scientific, technical, or other specialized knowledge. When presented with a *Daubert* challenge, a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The court agrees with Defendant that merely because Dr. Garcia has been treating Plaintiff for twenty years, that relationship does not provide Dr. Garcia with the requisite specialized knowledge to support the causation opinion offered here. Plaintiff's reliance on *Graves v. Brookwood Health Services*, 43 So.3d 1218 (Ala. 2009), that a treating physician's expert testimony "may be based in part on the history of the case, including both his present and past condition and symptoms as related by the patient" does not remedy Dr. Garcia's lack of experience and knowledge to offer a causation opinion related to epinephrine usage. While it is true that a treating physician's expert testimony may be based on the physician's treatment of the patient, it does not follow that this automatically qualifies the treating physician to opine regarding causation. Accordingly, Defendant's motion to exclude the causation opinion of Dr. Garcia is **granted**.

---

[2] Dr. Garcia testified as follows:
Q. Would you defer to Dr. Rothrock with regard to the cause of Mr. Murphy's stroke or to any other neurologist?
A. I would defer to a neurologist, yes.
Q. Would you also defer to a neurologist with regard to whether or not the epinephrine used in this case caused or contributed to cause Mr. Murphy's stroke?
A. Yes.
(Doc. 27-4 at 28).

## V.  Conclusion and Order

For the reasons set forth above, it is hereby **ORDERED** that Defendant's Motion to Exclude the Opinions of John F. Rothrock, M.D., and Ruben R. Garcia, M.D. (Doc. 21) is **granted in part** to the extent that Dr. Rothrock is precluded from testifying that it is "conceivable that the administration of epinephrine during the dental procedure may have contributed to Mr. Murphy's acute hypertension and the pontine hemorrhage that resulted," and Dr. Garcia is precluded from testifying that the "multiple extraction procedure performed by Dr. Precise and the epinephrine administered to Mr. Murphy in connection with that procedure was the cause of Mr. Murphy's massive pontine hemorrhage at Dixieland Dental on March 5, 2014, and ensuing death at Southeast Alabama Medical Center on March 8, 2014."

In all other respects, Defendant's motion (Doc. 21) is **denied**.

**DONE** and **ORDERED** this 28th day of April, 2017.

_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE